UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRYSTAL MITCHELL, *as an individual and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>UNITED HEALTH CENTERS OF THE SAN JOAQUIN VALLEY, *et al.*<br><br>Defendants. | Case No. 1:23-cv-0060-EPG<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF A CLASS ACTION SETTLEMENT<br><br>(ECF Nos. 86) |

## I. INTRODUCTION

The parties, Plaintiff Crystal Mitchell and United Health Centers of the San Joaquin Valey, have reached a settlement in this putative class action case that alleges Defendant violated state labor laws by failing to include bonus calculations into the rate of pay for paid time off and Defendant did not pay out all unpaid PTO to former employees upon separation.

Upon review of Plaintiff's motion and the record, the Court will grant the motion. (ECF No. 86).[1]

\\\

\\\

[1] The parties have consented to have consented to proceed before the undersigned for all purposes pursuant to the Local Rules and 28 U.S.C. 636(c)(1) (ECF Nos. 84, 85).

## II. BACKGROUND

### a. Plaintiff's Claims

On January 11, 2022, Plaintiff initiated this action by filing a class action complaint. (ECF No. 1). Plaintiff filed a First Amended Complaint on March 3, 2023. (ECF No. 6). In the first amended complaint, Plaintiff alleges she was an hourly, non-exempt employee of Defendant from about March 2, 2015, to October 20, 2022. (*Id.* at 3, 8). Plaintiff's amended complaint pleads both individual and class claims against Defendant for violations of the California Labor Code, Fair Labor Standards Act, IWC Wage Orders, and California Business and Professions Code. (*Id.* at 1, 11-18).

Plaintiff alleges that during her employment with Defendant she was not paid for every hour she worked because Defendant used an impermissible but uniform policy and practice of rounding its employees' time to the nearest quarter hour. (*Id.* at 3). Plaintiff states this practice often resulted in her not being paid for all the time she worked and not being paid all her overtime. (*Id.*). Plaintiff alleges that Defendant also failed to include commissions, non-discretionary bonuses and other items of compensation (including shift premiums and differentials) when determining all the non-exempt California employees' regular rate of pay for purposes of determining overtime. (*Id.* at 5).

Plaintiff further alleges that she and Defendant's other non-exempt California employees were also entitled to sick pay. (*Id.*). However, any sick pay used appeared on employees' wage statements as "PTOU", which constituted unscheduled PTO. (*Id.*). Plaintiff alleges that Defendant failed to include commissions, non-discretionary bonuses and other items of compensation (including shift premiums and differentials) when determining Plaintiff's and Defendant's other non-exempt California employees' regular rate of pay for purposes of sick pay. (*Id.* at 5).

Additionally, Plaintiff alleges that she was entitled to meal breaks in accordance with California law but was not always authorized or permitted to take compliant meal breaks. (*Id.* at 6). Specifically, throughout her employment Plaintiff sometimes worked shifts in excess of ten (10) hours. (*Id.*). Plaintiff says Defendant did not afford Plaintiff the opportunity for a second meal period during any eligible shift during her employment. (*Id.*). Plaintiff says that Defendant

also often required her to work during meal breaks due to understaffing issues. (*Id.*). Furthermore, when not afforded meal breaks, Plaintiff says Defendant did not pay Plaintiff premiums as required by California law.[2] (*Id.*).

Plaintiff further alleges that wage statements issued by Defendant failed to accurately show:

a. The gross wages earned, in violation of section 226(a)(1);
b. The total hours worked by the employee in violation of section 226(a)(2);
c. The net wages earned, in violation of section 226(a)(5); and
d. All applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate in violation of section 226(a)(9).

(*Id.* at 7).

Plaintiff's first cause of action alleges that, during the relevant time, Defendant intentionally and willfully failed to pay Plaintiff at least minimum wage for all time worked, in violation of California Labor Code section 1182 et seq. (*Id.* at 12-13).

Plaintiff's second cause of action alleges that Defendants intentionally and willfully failed to pay all overtime wages due to Plaintiff in violation of the Fair Labor Standards Act and California Labor Code §§ 510 & 1198. (*Id.* at 13).

Plaintiff's third cause of action alleges that during the relevant time period, she was not provided with compliant meal breaks, nor did she receive an additional hour of premium pay for each missed meal break at the required regular rate of compensation in Violation of Labor Code §§ 226.7, 512 And IWC Wage Orders. (*Id.* at 14-15).

Plaintiff's fourth cause of action alleges that Defendant failed to furnish accurate itemized wage statements in violation of Labor Code § 226(a). (*Id.* at 15).

Plaintiff's fifth cause of action[3], asserted on behalf of Plaintiff and the "Sick Pay Class" (also referred to as "Underpaid PTO Class"), alleges that Defendant engaged in unfair business practice in violation of California Business and Professions Code §§ 17200 *et seq.* by failing to properly calculate and pay redeemed sick pay. (*Id.* at 16-17).

Plaintiff's sixth cause of action, asserted on behalf of Plaintiff and the "Former-Employee Sub-Class" alleges that Defendant engaged in unfair business practices by failing to pay all wages

---

[2] Plaintiff also alleges that because Defendant failed to pay the required premiums, this also affected her bonus earnings and other non-discretionary pay. (ECF No. 6 at 6).
[3] Cause of actions one-three are individual claims and cause of actions four and five are class claims.

owed to employees upon cessation of employment in violation of Labor Code § 201. (*Id.* at 17-18).

### B. Previous Motion for Class Certification

On December 23, 2024, Plaintiff filed a motion for class certification. (ECF No. 46). Following briefing, a hearing, and Findings and Recommendations, the then-presiding District Judge granted Plaintiff's motion and certified the following classes:

- **Underpaid PTO Class/Sick Pay Class:** "All current and former non-exempt California employees of UHSJ who were eligible for and used PTO/PTOU during a workweek when he/she also earned a bonus pursuant to Bonus Policy FN0040 between July 17, 2018 and the date of certification (the 'Underpaid PTO Class')". (ECF No. 6-1 at 6).
- **Former Employee Sub-Class:** "All members of the Underpaid PTO Class whose employment ended at any time between July 17, 2019 and the date of certification (the 'Former Employee Sub-Class')." (*Id.*).

### c. Proposed Settlement of State and Federal Claims

On December 29, 2025, the parties filed a joint status report indicating that there were numerous pending state court cases in mediation in the Superior Court of California, County of Fresno: *Lupita Moreno v. United Health Centers of the San Joaquin Valley,* Fresno County Superior Court No. 22CECG01601.3; *Mirella Torres v. United Health Centers of the San Joaquin Valley*, Fresno County Superior Court No. 22CECG01760.4; and *Adriana Mora v. United Health Centers of the San Joaquin Valley,* Fresno County Superior Court No. 23CECG00030. (ECF No. 68). In those cases, a proposed resolution in principle was reached and the proposed resolution covered claims in this action. Plaintiff's counsel entered into a Joint Prosecution Agreement with the counsel representing plaintiffs in the state court cases. (*Id.*) The parties agreed to pursue the global resolution of this action and the state court cases in this court. The parties proposed the filing of a second amended complaint in order to incorporate the claims and named plaintiffs in the state court cases into this pending action. After which, the parties stated preliminary approval of the global resolution would be submitted to the Court. (*Id.*)

The parties filed a stipulation for leave to file a second amended complaint on January 27, 2026, which sought to add five additional named plaintiffs, bringing the total amount of named

plaintiffs to six and four additional causes of action, bringing the total amount of claims to ten. (*Id.* at 6-7). (ECF No. 70).

Following a hearing and briefing, the Court denied Plaintiff's stipulation to file a second amended complaint on April 27, 2026. (ECF No. 77)

On August 24, 2026, the Court held a status conference where the parties indicated they were close to finalizing an agreement and the Court ordered the Motion for Preliminary Approval to be filed no later than September 11, 2026. (ECF No. 83).

Plaintiff filed the present Motion for Preliminary Approval of Class Action Settlement on August 28, 2026. (ECF No. 86).

**d. Motion for Preliminary Approval of Settlement**

On August 28, 2026, Plaintiff filed a Motion for Preliminary Approval of a Class Settlement (ECF No. 86[4]). In the motion, Plaintiff moves the court for preliminary approval of the proposed Joint Stipulation of Class Action Settlement entered into by Plaintiff and Defendant. Plaintiff asks that the Court find that:

> all of the prerequisites to class certification pursuant to FRCP 23 are met, and the Settlement, which provides for payment of a $500,000 Maximum Settlement Amount is a fair, adequate and reasonable resolution of the limited claims (for allegedly underpaid redeemed paid sick leave and waiting time penalties) on behalf of the Class. Defendant United Health Centers of the San Joaquin Valley does not oppose the relief sought by way of the MPA.

(*Id.* at 2) (numbering omitted).

In support of the motion, Plaintiff has provided the declaration of counsel Jenny D. Baysinger, as well as the declarations and exhibits presented in connection with Plaintiff's Motion for Class Certification that were previously filed. (*Id.*).

**i. Proposed settlement class and class period**

The proposed settlement class covers "all current and former non-exempt California employees of UHSJ who were eligible for and used PTO/PTOU during a workweek when he/she also earned a bonus pursuant to Bonus Policy FN0040 between July 17, 2018, and December 31, 2025." (ECF No. 86-1 at 25). Defendant estimates that there are approximately 1,109 individuals that comprise the class. (*Id.* at 31).

---

[4] Citations to the Plaintiff's motion for preliminary approval of the class action settlement will refer to the blue text at the top right corner of each page as provided by the CM/ECF filing system.

### ii. Terms of the settlement agreement

The Gross Settlement Amount ("GSA") is $500,000. (*Id.* at 30) The GSA is premised on Defendant's representation that Class Members collectively worked a total of 19,962 Workweeks (*Id.* at 31). The average recovery of each class member is $450.85 and $25.04 per Workweek. (*Id.* at 10). The agreement proposes that the gross settlement amount be allocated as follows:

| | **Settlement Allocation** |
|---|---|
| GSA | $500,000 |
| Class Representative Service Payment | $7,500 |
| Litigation Costs Not to Exceed | $15,000 |
| Administrator Costs Not to Exceed | $18,000 |
| Class Counsel Fees Payment | $166,666.67 |
| **Expected Net Settlement Amount for Estimated 1,109 Members** | **$292, 833.33** |

(ECF No. 86-1 at 30-31).

Under the proposed settlement, Settlement Class members will receive a share of the Net Settlement Amount, which equates to an average net recovery of $264.05 per Class Member and $14.63 per Workweek. (*Id.* at 13). The motion represents the following in support of the average net recovery:

> This amount is expected to exceed the actual underpaid sick leave amount owed to any Class Member. Mitchell, herself, was underpaid less than $150 ($144.73) for redeemed PTOU (i.e. PTO that was associated with a sick leave reason). She was underpaid $1,455 (well above the average Class Member) if all redeemed PTO is considered, without regard to the *reason* for which it was redeemed.

(*Id.* at fn. 1)

> As part of the settlement, Plaintiff will
>
> …
>
> release and discharge Released Parties from all claims, transactions, or occurrences arising out of Plaintiff's employment that occurred prior to the date of execution of this Agreement, including, but not limited to: (a) all claims that were, or reasonably could have been, alleged, based on the facts contained, in the Complaints filed in the Legal Actions and the Operative Complaint and (b) all PAGA claims that were, or reasonably could have been, alleged based on facts contained in the Complaints filed in the Legal

> Actions, the Operative Complaint, and Plaintiffs PAGA Notices.

(*Id.* at 33). Furthermore, participating Class Members

> release Released Parties from all claims arising during the Class Period that were alleged, or reasonably could have been alleged, based on the facts asserted on a class-wide basis in the Complaint filed in the Action specifically including those claims for failure to properly calculate and pay for redeemed sick leave and associated waiting time penalties arising under California Labor Code §§ 201, 202, 203, 204, 210, 226, 245, et seq., and the Business and Professions Code. Except as set forth in Section 5.2 of this Agreement, Participating Class Members do not release any other claims. Participating Class Members are expressly not releasing claims asserted or otherwise implicated in the State Court Actions, other than those arising from the alleged failure to calculate and pay redeemed sick leave, by virtue of this Release, and are also not waiving claims for vested benefits, wrongful termination, violation of the Fair Employment and Housing ACT, unemployment insurance, disability, social security, workers' compensation, or claims based on facts occurring outside the Class Period…

(*Id.* at 34).

Within fourteen (14) calendar days after Defendant funds the GSA, the Settlement Administrator will mail checks for "Individual Class Payments, the Administration Expenses Payment, the Class Counsel Fees Payment, the Class Counsel Litigation Expenses Payment, and the Class Representative Service Payment. Disbursement of the Class Counsel Fees Payment, the Class Counsel Litigation Expenses Payment and the Class Representative Service Payments shall not precede disbursement of Individual Class Payments." *(Id.* at 32). The face of each check will state the date (not less than 180 days after the date of mailing) when the check will be voided. *(Id.*). For any individual class payment that is uncashed and cancelled following the void date, the Administrator shall transmit the funds represented by such checks to California Controller's Unclaimed Property Fund in the name of the Class Member. (*Id.*).

## III. LEGAL STANDARDS FOR CLASS CERTIFICATION AND SETTLEMENT

A court tasked with determining whether to approve a proposed class action settlement will almost always be confronted with a "difficult balancing act." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). "On the one hand, . . . there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Id*. (internal quotation marks and citations omitted). "But on the other hand, settlement class actions present unique due process concerns for absent class members, and the district court has a fiduciary duty to look after the interests of those absent class members." *Id.* (internal quotation marks and

citations omitted). "To ensure the interests of the absent class members are properly safeguarded, the judge must adopt the role of a skeptical client and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation." *Lusk v. Five Guys Enterprises LLC*, No. 1:17-CV-00762-AWI-EPG, 2021 WL 2210724, at *2 (E.D. Cal. June 1, 2021) (internal quotation marks and citation omitted).

Class actions are governed by Federal Rule of Civil Procedure 23. There are two stages to approving a class action settlement. In the first stage, which is at issue here, "the court preliminarily approves the settlement pending a fairness hearing, temporarily certifies a settlement class, and authorizes notice to the class." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014). At the second stage, the Court holds a fairness hearing, entertaining objections from putative class members, and thereafter making "a final determination as to whether the parties should be allowed to settle the class action pursuant to the terms agreed upon." *Id.*

"Parties seeking class certification must satisfy each of the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b)," with Plaintiffs arguing here that, under Rule 23(b)(3), common questions of law or fact predominate over individual class member questions and that a class action is superior to other methods for fairly and efficiently adjudicating this case. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017); (ECF No. 253-1, p. 20). Plaintiff bears the burden of meeting these requirements. *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir. 1977).

After the certification inquiry, the Court considers whether the settlement is "fair, reasonable, and adequate" under Rule 23(e)(2). *See Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (describing factors guiding inquiry under Rule 23(e)(2)).

The Court will evaluate the settlement agreement "as a whole" and "for overall fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). The Court does "not have a duty to maximize settlement value for class members," but instead, the "inquiry is much more modest and limited to ensuring that the class settlement is fair, reasonable, and adequate." *In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 678 (9th Cir. 2025). Relatedly, the

Court does not "have the ability to delete, modify or substitute certain provisions"; rather, "[t]he settlement must stand or fall in its entirety." *Id.* (internal citation and quotation marks omitted).

## IV. ANALYSIS

While the Court previously granted Plaintiff's motion for class certification, the present motion differs in that the class size has slightly increased from approximately 900 members to 1,109 members and the common question amongst the members has been more clearly defined. *(See* ECF No. 56). With that in mind, the Court will grant Plaintiff's motion for preliminary class certification and approval of the class action settlement for the reasons discussed below.

The Court will begin with Rule 23(a) and(b) factors regarding class certification and then turn to Rule 23(e) factors regarding approval of the settlement.

### a. Rule 23(a) Requirements

#### i. Numerosity

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 330 (1980). Courts in the Ninth Circuit have found the requirement satisfied when the class is composed of as few as thirty-nine members. *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citing *Jordan v. L.A. County*, 669 F.2d 1311, 1319 (9th Cir. 1982) (noting that class sizes of thirty-nine, sixty-four, and seventy-one are sufficient to satisfy the numerosity requirement), *vacated on other grounds*, 459 U.S. 810, 103 (1982)).

Here, joinder of the 1,109 class members as plaintiffs would be impracticable. Furthermore, the proposed Class is ascertainable because all proposed members have been employed by Defendant and can be easily identified through Defendant's employee and payroll records. Thus, the Court finds the numerosity requirement satisfied.

#### ii. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Class members need not "have all suffered a violation of the same provision of law"; rather, their claims must "depend upon a common contention." *Dukes*, 564 U.S. at 350.

The "common contention . . . must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon*, 150 F.3d at 1019. "Indeed, Rule 23(a)(2) has been construed permissively." *Id.* "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

The claims here are based on Defendant's alleged failure include FN0040 Bonus earnings when calculating the rate at which to pay redeemed PTO/PTOU, attendant uniform practice of only paying redeemed PTO/PTOU at the employee's base hourly rate, and the resultant failure to timely pay all wages due and owing at separation. (ECF No. 86-2 at 15). As such, the claims of Plaintiff and the Class stem from the same factual and legal issues and as a result, the Court finds the commonality requirement satisfied. *See Kincaid v. Educ. Credit Mgmt. Corp., Inc*., No. 2:21-CV-00863-TLN-JDP, 2024 WL 1344595, at *4-10 (E.D. Cal. Mar. 29, 2024) (finding commonality requirement met for similar Labor Code claims); *Goodwin v. Winn Mgmt. Grp. LLC*, No. 1:15-CV-00606-DAD-EPG, 2017 WL 3173006, at *6 (E.D. Cal. July 26, 2017) (same).

**iii. Typicality**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). As the Ninth Circuit has explained, "[t]he test of typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Jones v. Shalala*, 64 F.3d 510, 514 (9th Cir. 1995) (citing *Hanon*, 976 F.2d at 508).

While representative claims must be "reasonably co-extensive with those of absent class members," they "need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Here, as Plaintiff notes, her claims are effectively identical to the claims of the Class being resolved through the Settlement because they arise from the same factual basis and are based upon the same legal theories. (ECF No. 86-2 at 16). The Court finds the typicality requirement satisfied.

**iv. Adequacy of representation**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect

the interests of the class." "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (citations omitted). "The proper resolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000), *as amended* (June 19, 2000) (citations omitted).

Here, as this Court previously determined in granting class certification, Plaintiff is a member of the Class and has no conflicts of interest with other Class Members. (ECF Nos. 56,59). Furthermore, Plaintiff contends that she and Class Counsel have vigorously prosecuted this lawsuit on behalf of the Class. (ECF No. 86-2 at 16).

Finally, Plaintiff states that Plaintiff's counsel has no conflicts of interest that have arisen, and counsel is committed to the case and has experience in litigating similar cases, supported by certifications by numerous state and federal courts as competent and adequate class counsel. (*Id.*). Additionally, the Court notes that "[t]he competence of counsel seeking to represent a class" may be evaluated by considering whether they "are labor lawyers experienced in class actions." *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001). Plaintiff's counsel has provided declarations supporting her experience by listing numerous class action cases she has been involved in. (ECF No. 86-1).

**b. Rule 23(b) Requirements**

Plaintiff seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); (ECF No. 22, p. 24). The test of Rule 23(b)(3) is "far more demanding," than that of Rule 23(a). *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623-24).

**i. Predominance**

First, questions of law or fact common to class members must predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). This "predominance

inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (quoting *Amchem*, 521 U.S. at 623). "This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)." *Id.* "In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues." *Id.* "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1778 (2d ed.1986)).

Here, there are issues that will predominate over individual issues in the case, specifically whether Defendant's policies and practices alleged to underscore the Class Claims apply class wide as the FN0040 Bonus Policy applied to all UHSJ employees and UHSJ admittedly had a practice of only paying redeemed paid sick leave at an employee's base hourly rate (i.e. not including FN0040 Bonus amounts). (ECF No 86-2 at 17). As such, "[a] common nucleus of facts and potential legal remedies dominates this litigation," the Court finds that the predominance requirement is met. *Hanlon*, 150 F.3d at 1022.

**ii. Superiority**

Under Rule 23(b)(3), a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Pertinent to this finding is: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.; see Amchem*, 521 U.S. at 616. The purpose of this "requirement is to assure that the class action is the most efficient and effective means of resolving the controversy," and "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted); *see Local Joint Exec. Bd. of*

*Culinary/Bartender Tr. Fund v. Las Vegas Sands*, 244 F.3d 1152, 1163 (9th Cir. 2001) ("This case involves multiple claims for relatively small individual sums. . . . If plaintiffs cannot proceed as a class, some – perhaps most – will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover.").

The Court concludes that a class action is a superior method of resolving this action. First, it does not appear economical for each individual member of the proposed 1,109-member class to bring their claims separately. The class action litigation here allows the class members to pool their individual claims together, which claims would otherwise not be economical to litigate. *See Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sand*s, 244 F.3d 1152, 1163 (9th Cir. 2001) ("This case involves multiple claims for relatively small individual sums. . .. If plaintiffs cannot proceed as a class, some – perhaps most – will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover."). Further, a lack of knowledge of the legal system and limited economic resources would likely deprive most class members of the opportunity to pursue their claims outside of a class action. While there are State Court Class Actions, Plaintiff represents that those actions assert wage and hour claims on behalf of the same class of individuals, those claims are different and the specific underpaid sick leave (and associated derivative) theories are neither being asserted or resolved in those matters. (ECF No. 86-2 at 17). Finally, any prospective class member that wishes to pursue their own case may opt out of the class.

Third, this District is a desirable forum for the litigation as the operative complaint alleges that Plaintiff primarily performed his work for Defendant within the District. Thus, much of the evidence will likely be found within this District and the Court can efficiently conduct proceedings here. *See Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 486 (N.D. Cal. 2017) ("This case involves drivers who serviced routes in Northern California, many of whom worked out of Flowers warehouses in San Jose and Salinas, which are in this District. Because much of the evidence will be found here, it would be efficient to try the case here."). Finally, there are no apparent difficulties likely to be encountered in managing this class action. Thus, the Court finds that the superiority requirement is met.

\\\

**c. Rule 23(e) Requirements**

If a proposed settlement agreement "would bind class members," the Court must find that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). A court considers whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> (i) the costs, risks, and delay of trial and appeal;
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Ninth Circuit has provided the following guidance regarding Rule 23(e)(2):

> In this Circuit, a district court examining whether a proposed settlement comports with Rule 23(e)(2) is guided by the eight "*Churchill* factors," viz., "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement."

*Kim*, 8 F.4th at 1178 (quoting *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)); *see Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (listing the *Churchill* factors). "In addition, the settlement may not be the product of collusion among the negotiating parties." *In re Mego*, 213 F.3d at 458. "This list is not exclusive, and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) (citations omitted).

Moreover, consideration of these factors alone is insufficient. *Id.* at 1179. Because Rule 23(e)(2) also requires courts to "now consider 'the terms of any proposed award of attorney's fees' when determining whether 'the relief provided for the class is adequate[,]' . . . courts must balance the 'proposed award of attorney's fees" vis-à-vis the 'relief provided for the class in determining whether the settlement is 'adequate' for class members." *Briseño v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)(C)(iii)). This is done by

reviewing the "so-called *Bluetooth* factors to smoke out potential collusion." *Id.* at 1023. Signs of such collusion include:

> (1) "when counsel receive[s] a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class.

*Id.* (quoting *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d at 947).

The Court will begin with the *Churchill* factors to determine if the proposed settlement aligns with Rule 23(e)(2) and then move to the *Bluetooth* factors, to determine if there are any signs of potential collusion.

**i. *Churchhill Factors***

**a. The strength of Plaintiff's case**

A court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Adoma v. Univ. of Phoenix, Inc.*, 913 F.Supp.2d 964, 975 (E.D. Cal. 2012) (citation omitted). However, "the court does not reach any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this litigation." *Id.* (internal citation and quotation marks omitted).

**i. Failure to Pay Timely Wages upon Separate and Unfair Business Practices Itemized Wage Statements**

Plaintiffs allege two causes of action regarding the Class: (1) failure to pay wages in a timely manner upon separation and (2) unfair business practices based on an alleged failure to properly calculate and pay redeemed paid sick leave under California law. (ECF No. 6). During the class period, Defendants withheld minimum and overtime wages, sick pay, meal and rest premium wages as a result of a uniform policy, pattern and practice. *(Id.* at 18).

Regarding risks, Plaintiff states that Defendant

> asserted and would have continued to assert numerous legal and factual grounds to defend against the claims of the and/or maintained certification of such claims, including, but not limited to, 1) that FN0040 Bonuses are discretionary and not includable in the "regular rate of pay", 2) that the rate provisions within 246(l) do not come within the "same conditions" language of section 246(f) and thus providing paid sick leave at the "regular rate" is not required if the accrual is satisfied through a preexisting non-delineating PTO

> policy, 3) that only PTO/PTOU that was redeemed for an actual paid sick leave reason need be paid at the "regular rate of pay", and 4) that waiting time penalties are unavailable because failures to pay were not "willful" in light of the limited legal authority relating to whether redeemed sick pay constitutes wages *and* whether an overarching "PTO" policy needs to pay redeemed paid sick leave at the regular rate of pay in order to satisfy the HWHFA.

(ECF No. 86-2 at 21).

In valuing the claims, Plaintiff estimates that Defendant could face a potential maximum liability of exposure of $1,623,603 in damages and statutory penalties to the Class based on the released Class claims. (*Id.*). Plaintiff further represents that "only $697,539 of that amount arises from allegedly underpaid wages—only $168,291 based on the redemption of PTOU (which is most likely to have been redeemed for a "sick leave purpose."). (*Id.* at 21-22).

**ii. The risk, expense, complexity, likely duration of further litigation, and risks of maintaining class action status throughout trial**

"Approval of settlement is 'preferable to lengthy and expensive litigation with uncertain results.'" *Munoz v. Giumarra Vineyards Corp.*, 2017 WL 2665075, at *9 (E.D. Cal. June 21, 2017). Moreover, "[e]mployment law class actions are, by their nature, time-consuming and expensive to litigate." *Aguilar v. Wawona Frozen Foods*, 2017 WL 2214936, at *3 (E.D. Cal May 19, 2017).

In support of the parties' proposed settlement, Plaintiff provides the following estimate for the potential recovery of each Class:

> Class Counsel (1) applied no discount to the upper value of the underpaid sick pay claim based on redemption of PTOU because it is plain that UHSJ simply used the base hourly rate, as opposed to the "regular rate of pay" when calculating redeemed PTOU, leaving $168,291, (2) applied a 50% discount to the upper value of underpaid wages associated with the redemption of PTO (rather than PTOU) to account for the reality that a significant amount of this time off was likely utilized for a non-sick leave reason (i.e. vacation or other personal time off) and thus was arguably not required to be paid at the "regular rate", leaving $264,624, and (3) applied a 50% discount to the waiting time penalty claim based upon UHSJ's contention that redeemed sick pay cannot underscore a waiting time penalty claim (the first judicial decision that indicates such can underscore a waiting time penalty claim was issued in May 2020 by a federal district court—*Flores v. Dart Container Corp.*, 2020 WL 2770073 (E.D. Cal. 2020)—and thus is arguably not "binding" or sufficiently definitive to reach the requisite level of "willfulness" to justify imposition of waiting time penalties) and that any failures to properly calculate and pay redeemed sick leave were not willful, but instead were the product of a good faith mistake because the language of the Healthy Workplaces Healthy Families Act was changed

> shortly before it became effective to include the "regular rate of pay" language and UHSJ's failure to identify the change was excusable, leaving $463,032.
>
> The MSA represents a lofty 55.8% of UHSJ's realistic exposure; 100% net recovery of the underpaid PTOU wages and almost 70% of the underpaid wages if PTO (in addition to PTOU) is also considered.

(ECF 86-2 at 22).

Based on the record evidence, including the discovery so far taken and strengths and weakness of the case, the Court concludes that this consideration weighs in favor of approving the parties' proposed settlement.

**b. The amount offered in settlement**

The amount offered in settlement "is generally considered the most important" factor of any class settlement. *See Bayat v. Bank of the West*, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015). In determining whether the amount offered in settlement is fair and reasonable, a court compares the proposed settlement amount to the maximum potential amount recoverable through successful litigation. *See In re Mego*, 213 F.3d at 459. "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Id.* (citation omitted). For complex class action cases, Ninth Circuit has "a strong judicial policy that favors settlements. Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific Enter. Sec. Lit.*, 47 F.3d 373, 378 (9th Cir. 1995) (internal quotation marks and citation omitted).

**i. Percentage recovery**

If the Class were to prevail on all claims, the estimated potential maximum recovery would be $1,6123,603 in penalties. The gross settlement amount of $500,000 represents 30.8% of the *maximum* recovery available to the Class; between 70% and 106% of the *maximum* allegedly underpaid PTO/PTOU wages—more than 300% of the underpaid wages associated with the use of PTOU. (ECF No. 86-2 at 20). Ultimately, the Court finds this recovery reasonable and above other percentages that courts have approved. *In re Mego Fin. Corp. Secs. Litig.,* 213 F.3d 454, 459 (9th Cir.2000) (holding that class action settlement recovering 16% of potential exposure was fair and reasonable; "[i]t is well-settled law that a cash settlement amounting to only a fraction of

the potential recovery does not per se render the settlement inadequate or unfair. Rather, the fairness and the adequacy of the settlement should be assessed relative to risks of pursuing the litigation to judgment"; noting that whether the settlement is fair and adequate depends on the "the difficulties in proving the case");*Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D. Cal. 2015) ("From here, the agreed upon common fund represents between 27 percent and 11 percent of the total potential recovery. The Court is satisfied that these numbers are fair."); *Villegas v. J.P. Morgan Chase & Co.,* No. CV 09-00261 SBA EMC, 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (holding that gross class action settlement of approximately 15% of the potential recovery was fair and reasonable).

**ii. Allocation of settlement shares**

The Court also considers whether the allocation of the settlement is fair, reasonable and adequate, with it being "reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits." *In re Omnivision Techs.*, Inc., 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008). The Plaintiff represents that a net settlement amount of at least $292, 833.33 is expected to be available for actual distribution to Participating Class Members, which equites to an average net recovery of $264.05 per class member and $14.63 per workweek.

The Court finds this allocation acceptable.

Accordingly, the allocation of settlement payments based on the number of wage statements that were inaccurate during the class period would be fair to the class members and aggrieved employees.

**c. The extent of discovery completed and the stage of proceedings; experience and views of counsel**

"An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Riker v. Gibbons*, No. 3:08-CV-00115-LRH, 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010) (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11:42 (4th ed.2002)); *see also Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527–28 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." (citations omitted)).

Here, Plaintiff represents that

> Through independent inquiry, research, and informal discovery, Class Counsel thoroughly and diligently investigated and pursued the Class Claims. This process has included, but not been limited to, (1) obtaining and reviewing Plaintiff's personnel file, payroll records, and time records; (2) researching Defendants, their relationship organization, and the location and size of UHSJ's operations; (3) reviewing other pending actions to determine the scope and impact on this matter and limiting the scope of this action accordingly; (4) identifying, researching, and pleading the appropriate claims; (5) exhausting administrative remedies; (6) identifying, requesting, securing, and reviewing pertinent policies, practices, and procedures; (7) identifying, requesting, and securing the time and payroll records for a sampling of the Class; (8) propounding formal discovery to secure relevant policy documents and numerical information regarding the size of the classes and the scope of the claims, (9) deposing Defendant in order to determine the scope of the claims and their ripeness for certification; (10) retaining an expert to analyze the payroll data provided by Defendants and personally conducting spot checks to ensure the accuracy of the damages calculations; (11) creating a reliable damages model for mediation; (12) securing formal certification of claims on behalf of the Underpaid PTO Class and Former Employee Sub-Class; and (13) developing and implementing a strategy for mediation and settlement following certification.

(ECF No. 86-2 at 11). Additionally, Plaintiff states that counsel retained an economic expert to evaluate data provided by Defendant in order to calculate the underpaid wages and associated waiting time penalties of the sampled individuals. (*Id.* at 12).

Finally, Plaintiff's counsel provided a declaration generally summarizing the experience with class action litigation and stating that the settlement is fair and reasonable and in the best interests of the those concerned. (ECF No. 86-1).

Accordingly, this factor weighs in favor of approval.

**d. The reaction of the class members to the proposed settlement**

At this stage, the reaction of the class members to the proposed settlement is unknown, so this factor cannot be addressed.

**ii. Collusion (*Bluetooth* Factors)**

The Court now turns to the *Bluetooth* factors, which are indications courts evaluate to determine whether class counsel have allowed their own interests to infect settlement negotiations— (1) whether counsel receives a disproportionate amount of the settlement; (2) whether there is a clear "sailing agreement"; (3) and whether the agreement contains a "kicker" or "reverter" clause. *Briseño*, 998 F.3d at 1024. The Court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941; *see also Zucker v. Occidental Petroleum Corp.*,

192 F.3d 1323, 1328–29 (9th Cir. 1999). Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). As a result, the Court must assume a fiduciary role for the class members in evaluating a request for an award of attorneys' fees from the common fund. *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009).

The Ninth Circuit has approved two methods for determining attorneys' fees in cases where the award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The Court retains discretion in common fund cases to choose either method. *Id.*; *Vu v. Fashion Inst. of Design & Merch.*, No. CV 14-08822 SJO (EX), 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22, 2016). Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the Court may award class counsel a given percentage of the common fund recovered for the class. *Id.* In the Ninth Circuit, a twenty-five percent award, is the "benchmark" amount of attorneys' fees, but courts may adjust this figure if the record shows special circumstances justifying a departure. *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)). The Ninth Circuit has permitted courts to award attorneys' fees using this method "in lieu of the often more time-consuming task of calculating the lodestar." *Bluetooth*, 654 F.3d at 942. In evaluating a percentage for attorneys' fees, the Court is required to "consider[] all the circumstances of the case and reach a reasonable percentage." *Vizcaino*, 290 F.3d at 1048. Such circumstances include (1) the results reached for the class; (2) the risk to class counsel; (3) counsel's performance; and (4) the amount sought to be awarded compared to the market rate. *Id.* at 1048-49.

Here, Defendant will not oppose or impede any application or motion by Plaintiff's counsel for attorney's fees not to exceed $166,666.67 (or approximately 33%) of the gross settlement. (ECF No. 86-1 at 30). Additionally, the settlement agreement caps costs at $15,000,

subject to this Court approving the settlement. (*Id.*).

Plaintiff generally indicates that the fee award is warranted based on significant benefits that Plaintiff and Class Counsel have conveyed upon the class. The Court finds that the requested attorney's fees fall within the range of reasonableness warranting preliminary approval of the settlement. The Court notes that 33% request is higher than typically awarded. However, the Court recognizes that this case faced great difficulty with the numerous defenses available to Defendant and the percentage of recovery proposed in comparison to Defendant's maximum exposure.

Next, the proposed settlement contains a clear sailing provision, *i.e.*, a provision that Defendants will not object to a certain fee request. Notably, it states that Defendants will not oppose a fee award that does not exceed 1/3 of the settlement and will not oppose costs that do not exceed $15,000 (*Id.*). However, there is no "reverter" clause, *i.e.*, a provision that fees not awarded revert to Defendant rather than the class fund. Rather, the settlement agreement expressly states that "None of the Gross Settlement Amount will revert to Defendant." (*Id.*)

The Court concludes that this factor weighs in favor of preliminary approval.

**d. Class representative service payment**

A court may award incentive payments to named plaintiffs in class action cases. *Rodriguez*, 563 F.3d at 958-59. The purpose of incentive awards is to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id.* To justify notable disparities between a class representative award and what other class members receive, a Plaintiff must present "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).

The Ninth Circuit has emphasized, however, that "district courts must be vigilant in scrutinizing all incentive awards." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted). In keeping with that admonition, courts have declined to approve incentive awards that represent an unreasonably high proportion

of the overall settlement amount or are disproportionate to the recovery of other class members. *See Ontiveros*, 303 F.R.D. at 365-66 (finding an incentive award of $20,000, comprising 1% of the common fund, to be excessive under the circumstances, and reducing the award to $15,000, where class representative spent 271 hours on the litigation and relinquished the opportunity to bring several of his own claims in order to act as class representative)*; see also Ko v. Natura Pet Prods., Inc.*, Civ. No. 09–2619 SBA, 2012 WL 3945541, at *15 (N.D. Cal. Sept. 10, 2012) (holding that an incentive award of $20,000, comprising one percent of the approximately $2 million common fund was "excessive under the circumstances" and reducing the award to $5,000). In reducing an award, courts have noted that overcompensation of class representatives could encourage collusion by causing a divergence between the interests of the named plaintiff and the absent class members, destroying the adequacy of class representatives. *See Staton*, 327 F.3d at 977-78; *see also Radcliffe*, 715 F.3d at 1165.

Here, the settlement agreement provides for an "Class Representative Service Payment," up to $7,500 intended to compensate named Plaintiff. The motion argues that, while the amount is higher than the Ninth Circuit benchmark of $5,000, the amount is warranted because Plaintiff provided significant contributions to the case, including "submitting to sworn deposition, participating in two mediations, and assisting in the preparation of the successful motion for class certification." (ECF No 86-2 at 26). Counsel estimates Plaintiff spent approximately 100 hours pursuing claims on behalf of her fellow class members. (ECF No. 86-1 at 17).

The proposed payment represents about 1.5% of the gross settlement amount ($7,500 / $500,000). And the Court notes that the requested award is slightly higher than the $5,000 incentive award that has been recognized as "presumptively reasonable" by some courts. *Austin v. Foodliner, Inc.*, No. 16-CV-07185-HSG, 2019 WL 2077851, at *8 (N.D. Cal. May 10, 2019).

The Court will preliminarily approve the settlement, noting that is only slightly higher than Ninth Circuit benchmarks and Plaintiff indicates she devoted significant time and participation in successfully litigating this action.

**e. Approval of a settlement administrator**

The parties agree to use third-party settlement administrator ILYM Group, Inc.as Administrator, with Administration Expenses not to exceed $18,000. (ECF No. 86-2 at 13).

According to Plaintiff's counsel, ILYM has "substantial experience in administering class action settlements." (*Id.,* p. 25). The Court finds ILYM Group, Inc. is an appropriate settlement administrator should the settlement be eventually approved.

**f. Notice procedures**

For proposed settlements under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B); *see also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e)."). A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC*, 361 F.3d at 575 (internal quotations and citations omitted). The absent class members must be provided with notice, an opportunity to be heard, and a right to opt-out of the class. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 349 (2011). "The notice must clearly and concisely state in plain, easily understood language" the following information:

> the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

> Plaintiff represents the following
> The Class Notice meets all requirements of procedural due process and Rule 23(e) by (1) identifying the Parties; (2) describing the claims and the Class Action in a straightforward manner; (3) succinctly describing the essential terms of the Settlement, including Mitchell's proposed Service Award and the amount Class Counsel will request for attorneys' fees and costs; (4) identifying the existence of other cases and the potential impact participation in the instant action may have; (5) identifying the claims to be released; (6) identifying all parties against whom claims are being released; (7) providing information on how to participate in, opt out of or object to the Settlement; (8) clearly providing all applicable deadlines for such action; (9) informing Class Members of the consequences of excluding themselves; and (10) advising Class Members that, if they choose to participate and the Settlement is approved, they will be bound by the resulting judgment. Further, the Class Notice clearly explains the manner in which Class Members can obtain further information (e.g., from Class Counsel, through the Court's website, or the Administrator's website) and that the Final Approval Hearing may be moved without further notice.

(ECF No. 86-2 at 24).

The Court finds the proposed notice acceptable.

## V. CONCLUSION AND ORDER

Based on the forgoing, IT IS ORDERED as follows:

1. Plaintiff's motion for class certification and preliminary approval (ECF No. 86) is GRANTED.
2. The following settlement class is conditionally certified: All current and former non-exempt California employees of UHSJ who were eligible for and used PTO/PTOU during a workweek when he/she also earned a bonus pursuant to Bonus Policy FN0040 between July 17, 2018, and December 31, 2025.
3. Plaintiff Crystal Mitchell is conditionally approved as the class representative for the settlement class.
4. Mayall Hurley P.C. is conditionally approved as class counsel for the settlement class.
5. The Court conditionally approves ILYM Group, Inc as the settlement administrator and payment not to exceed $18,000 in costs.
6. The Court approves, and authorizes the issuance of, the notice (as submitted to the Court) and the parties shall implement the notice schedule set forth in the settlement agreement.
7. A final approval hearing is scheduled for February 12, 2027, at 10:30 a.m. before Magistrate Judge Erica P. Grosjean, in Courtroom 10 on the 6th Floor of the Robert E. Coyle United States Courthouse. To connect to the conference via telephone, the parties shall (1) dial 1-669-254-5252, (2) enter 161 733 0675 for the meeting ID followed by #, (3) enter # when asked for the participant ID, (4) enter 740484 for the meeting passcode followed by #, and (5) enter *6 to unmute.
8. A combined motion for final approval of the settlement, the class incentive award, and an award of attorney fees and costs shall be filed by no later than January 22, 2026.

\\\

\\\

\\\

\\\

9. The settlement administrator shall file a report regarding the outcome of the notice process by no later than January 22, 2026.

IT IS SO ORDERED.

Dated: **October 20, 2026**

/s/ Eric P. Grosjean

UNITED STATES MAGISTRATE JUDGE